UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| BLYTHE REICHERT ERICKSON, Individually and as next of kin and guardian of Faun Ivy Hollingsworth, a minor child,<br><br>        Plaintiffs,<br><br>v.<br><br>LYNN FAHRMEIER and MRS. DONNA FAHRMEIER,<br><br>        Defendants. | No. 3:17-CV-518<br>Judge Phillips |

## **MEMORANDUM OPINION**

In 2016, plaintiff Blythe Reichert Erickson ("Ms. Erickson") and her daughter, Faun Ivy Hollingsworth ("Ms. Hollingsworth") purchased Katahdin sheep from defendant Lynn Fahrmeier and his wife Donna Fahrmeier. After those sheep aborted their fetuses, plaintiffs brought several claims against the defendants, including negligence, breach of contract, negligent infliction of emotional distress, negligent misrepresentation, and violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-104 (2018).

Defendants have moved for summary judgment [Doc. 27] as to all claims against Mrs. Donna Fahrmeier and for partial summary judgment as to the claims of negligent infliction of emotional distress, negligent misrepresentation, and violation of the TCPA against Mr. Lynn Fahrmeier. Plaintiffs have conceded that all claims against Mrs. Donna

Fahrmeier should be dismissed [Doc. 31 at p. 4; Doc. 32 at p. 8]. The parties have filed briefs and supporting documents regarding the claims against Mr. Fahrmeier [Docs. 28, 31, 32, and 33] and the motion is ripe for determination.

For the reasons set forth herein, the defendants' motion for partial summary judgment [Doc. 27] will be **GRANTED**.

I. **Relevant Facts**

Ms. Erickson operates a farm in Rogersville, Tennessee, where she raises sheep [Doc. 1 at ¶ 3]. Her daughter, Ms. Hollingsworth, lives with her and helps her work the farm [*Id*.].

Mr. and Mrs. Fahrmeier operate a farm in Wellington, Missouri [Doc. 28-1 at p. 9], where they grow crops and raise Katahdin sheep [*Id*. at p. 10]. Mrs. Fahrmeier teaches Family and Consumer Sciences for grades 7 through 12 [*Id*. at p. 5]. The parties agree that she was not involved in the sale of sheep to Ms. Erickson that is at issue in this case [*see* Doc. 32 at p. 1].

In early 2014, a group of the Fahrmeiers' sheep was infected with Campylobacter bacteria, which Mr. Fahrmeier describes as a "fairly common bacteria, pretty much endemic in the sheep industry" [Doc. 28-1 at pp. 18—19]. This infection resulted in a phenomenon referred to as an "abortion storm" on the farm, where a number of ewes in the flock had an abortion around the same time [*Id*. at p. 23]. Following this event, Mr. Fahrmeier claims that he began vaccinating the sheep on his farm for Campylobacter and he has not had a recurrence of this issue since then [*Id*. at p. 25]. The plaintiffs contend

that Mr. Fahrmeier did not follow proper vaccination protocol and thus the sheep sold to the plaintiffs, as progeny of infected sheep, were carriers of Campylobacter bacteria [Doc. 32 at p. 2].

On November 20, 2015, Ms. Erickson contacted Mr. Fahrmeier via Facebook Messenger regarding the Katahdin sheep on his farm [Doc. 28-1 at p. 41; Doc. 28-2 at p. 1]. Those communications eventually turned to negotiations for the sale of sheep from Mr. Fahrmeier to Ms. Erickson. Ultimately, Ms. Erickson purchased 29 ewe lambs and one ram lamb from Mr. Fahrmeier for $11,122.50 and Ms. Hollingsworth purchased 11 ewe lambs for $4,950.00 [Doc. 28-1 at p. 35].

Prior to the culmination of their purchase agreement, Mr. Fahrmeier made the following disclosure on April 27, 2016:

> First, full disclosure on any health concerns in my flock. In December 2013 we were invaded by a huge flock of starlings. They stayed around for 5-6 days, crapping on everything, then left. About three weeks later at the start of 2014 lambing, we started having abortions. Just a few at first and then increasing. Antibiotics did not seem to help. After about a dozen samples taken to the MU Vet Diagnostic lab they isolated Campylobacter-Juni. This strain cannot be treated with antibiotics but there is a vaccine. We have vaccinated the ewes the last two years and have not had a single problem.

[Doc. 28-2 at p. 5]. In response to this disclosure, Ms. Erickson responded:

> I appreciate the full disclosure. We all have various issues once you have been doing it long enough, with enough sheep. Those who say they've never had issues are lying or rookies. Everyone gets a turn … As far as the Campylobacter, do you recommend vaccinating these girls I will be getting and is it a live vaccine?

[*Id*.]. Mr. Fahrmeier then stated:

> I think that because the ewe lambs were born to vaccinated ewes, if I give the lambs a vaccine shot before they leave the farm, that there would be very

3

> little to no chance that they would be carriers of the live bacteria. Best check with your vet.

[*Id*.]. Ms. Erickson replied:

> I will ask him and I appreciate your concern, invariably, bringing in new stock always adds to the equation. But, I want your stock and think they will greatly improve what I'm doing.

[*Id*.].

Mr. Fahrmeier delivered the sheep to Ms. Erickson on August 3, 2016 [Doc. 28-1 at p. 36]. On December 26, 2016, Ms. Erickson told Mr. Fahrmeier that the ewes purchased from him were starting to abort their fetuses [Doc. 28-2 at p. 21]. This abortion storm continued through February 2017 resulting in 20 to 25 abortions [Doc. 28-1 at pp. 33, 58]. A few of the sheep purchased from Mr. Fahrmeier died from infection and auto-immune related issues and the remaining sheep were sold for slaughter [*Id.* at pp. 34, 57]. During this time, Ms. Erickson sought assistance from doctors from the University of Tennessee College of Veterinary Medicine to provide professional advice and investigate the cause of the abortion storm occurring at her farm [Doc. 28-3 at ¶¶ 1—4]. Diagnostic tests and necropsies found the Campylobacter bacteria in the fetuses [*Id*. at ¶ 5].

On January 20, 2017, Ms. Erickson asked whether Mr. Fahrmeier had vaccinated the sheep against Campylobacter and he responded, "We did not start our vaccination routine here until mid August so I am sure I did not vaccinate those sheep" [Doc. 28-2 at p. 23]. Ms. Erickson then stated, "I was under the impression you would be vaccinating them. Kind of puts me in a pickle now. I can [sic] booster them since they weren't previously vaccinated" [*Id.* at p. 24]. Mr. Fahrmeier added, "Let me check my notes when

I get to the house. If I said I was going to vaccinate them I probably did, I just don't remember. I know I ran my ewe lambs through the chute in mid to late August" [*Id*. at p. 24]. Later, Mr. Fahrmeier sent Ms. Erickson a photograph of a handwritten note containing the list of sheep to be sold to Ms. Erickson; he claims he made the list on August 2, 2016 before taking the sheep to the vet: "I had made a note to myself to give your ewes a vaccine so I assume that I did as they were going in the trailer" [*Id*.]. Ms. Erickson argues that this note does not provide proof that the vaccine was given, only that Mr. Fahrmeier intended to do so [Doc. 32 at p. 4].

Ms. Erickson admittedly did not ask her veterinarian if the purchased sheep needed a booster shot of Campylobacter vaccine, nor did she give the sheep a booster shot of the vaccine [Doc. 28-1 at pp. 40, 46, 49]. Although Ms. Erickson claims that Mr. Fahrmeier did not provide her with any information regarding the need for a booster shot [Doc. 32 at p. 3], their exchange of messages reveals that he stated on January 20, 2017, "I don't know of [sic] it is too late to give a booster or not. I would suggest talking to your vet" [Doc. 28-2 at p. 25]. Ms. Erickson emphasizes that, in late February 2017, Mr. Fahrmeier stated, "[m]y only regret was suggesting that the ewe lambs might not need a booster vaccine, but I did suggest that you talk to your vet about that, which you agreed you would" and then, "I wish I would have never suggested that one shot of vaccine might be enough" [Doc. 28-2 at pp. 31—32]. Ms. Erickson characterizes these statements as admissions that Mr. Fahrmeier *did not* suggest that she contact her veterinarian about a booster vaccine [Doc. 32 at p .5].

5

One cold night in January 2017, Ms. Hollingsworth, then age 15, had been caring for a lamb that died and then she discovered "others that had been aborted," so she ran into the woods on the farm [Doc. 28-1 at p. 59]. She stayed there for a couple of hours "because I wasn't really feeling like I had any meaning in my life because my sheep were dying" [*Id*.]. Other than sitting in the snow wearing light clothing for a couple of hours, Ms. Hollingsworth took no other steps to harm herself while she was in the woods [*Id*. at pp. 61—62]. Ms. Hollingworth eventually returned to the house and apologized to her mother for staying in the woods [*Id*. at pp. 60—61]. The plaintiffs characterize this event as an attempted suicide because Ms. Hollingsworth was "thinking I would freeze to death" [Doc. 32-3 at p. 2]. Plaintiffs emphasize that because Ms. Hollingsworth suffers from Reynaud's Disease, her fingers and hands were black and purple after her exposure to the cold; plaintiffs had to slowly warm Ms. Hollingsworth's fingers and toes so she did not lose digits [Doc. 32-4 at pp. 2—3]. A few weeks later, Ms. Erickson contacted Cherokee Health Systems and arranged for Ms. Hollingsworth to receive mental health counseling [Doc. 28-1 at pp. 37—39].

**II.     Standard of Review**

As an initial matter, the Court notes that it applies federal procedural law to cases over which it has diversity jurisdiction. *See Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). "Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis ex rel. Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479—80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual

7

issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

### III. Negligent Infliction of Emotional Distress

The complaint alleges that Ms. Hollingsworth suffered emotionally when the ewes began to abort their fetuses and she "became seriously clinically depressed and attempted suicide" [Doc. 1 at ¶¶ 55—56]. Plaintiffs claim that Ms. Hollingsworth has "suffered extreme emotional damage that requires ongoing psychiatric treatment consisting of therapy and medication" and that her damages were caused by Mr. Fahrmeier's failure to vaccinate the ewes [*Id.* at ¶¶ 57—61].

Defendants argue that the claim of negligent infliction of emotional distress should be dismissed because plaintiffs cannot establish that Ms. Hollingsworth suffered a "serious" or "severe" psychological injury [Doc. 28 at pp. 9—10]. Plaintiffs argue that they have presented sufficient facts, through her medical records, to create a jury issue as to whether Ms. Hollingsworth suffered serious emotional distress [Doc. at pp. 8—13]. In reply, defendants contend that Ms. Hollingsworth cannot recover for emotional injuries arising from property damage [Doc. 33 at pp. 2—4].

Under Tennessee law,[1] a claim for negligent infliction of emotional distress requires proof of the elements of a general negligence claim, that is: (1) duty, (2) breach of duty,

---

[1] A federal court exercising diversity jurisdiction over state-law claims must apply the substantive law of the state in which it sits. *See Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 894 (6th Cir. 1997) (citing *Erie*, 304 U.S. at 78). Both parties agree that the substantive law of Tennessee applies to this case [Doc. 28 at pp. 7—8; Doc. 32 at p. 8].

8

(3) injury or loss, (4) causation in fact, and (5) proximate causation. *Camper v. Minor*, 915 S.W.2d 437, 446 (Tenn. 1996). A negligent infliction of emotional distress claim is only available for "serious" or "severe" emotional injuries.[2] *Id.* Much ink has been spilled in distinguishing "stand-alone" claims which require the plaintiff to support her claim for serious or severe emotional injury with expert medical or scientific proof, *see e.g., Rye v. Women's Care Ctr. of Memphis*, 477 S.W.3d 235, 270—71 (Tenn. 2015), *cert. denied*, 136 S. Ct. 2452 (2016); *Eskin v. Bartee*, 262 S.W.3d 727, 735 (Tenn. 2008), and those claims which are "bystander" or "parasitic" claims of emotional distress and do not require expert proof of emotional injuries. *See Rye*, 477 S.W.3d at 271; *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 206—07 (Tenn. 2012); *Estate of Amos v. Vanderbilt Univ.*, 62 S.W.3d 133, 137 (Tenn. 2001). Further, the Tennessee Supreme Court has outlined six factors to be considered in assessing whether the plaintiff has suffered a serious or severe mental injury. *See Rogers*, 367 S.W.3d at 209—10.

The Court finds it unnecessary to wade into this thicket for the simple reason, as highlighted in defendants' reply brief, that Ms. Hollingsworth cannot recover for emotional distress arising from damage to property. Absent fraud, malice, or like motives by Mr. Fahrmeier, the law does not permit recovery for emotional distress damages when the defendant's negligence results in property damage. *Lane v. Estate of Leggett*, No. M2016-00448-COA-R3-CV, 2017 WL 1176982, at *5 (Tenn. Ct. App. Mar. 29, 2017). In *Lane*,

---

[2] A serious or severe mental injury occurs if "a reasonable person, normally constituted, would [have been] unable to adequately cope with the mental stress engendered by the circumstances of the case." *Rye v. Women's Care Ctr. of Memphis*, 477 S.W.3d 235, 270 (Tenn. 2015) (quoting *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 210 (Tenn. 2012)).

the defendant's vehicle struck the building that housed the plaintiff's business and caused a fire, resulting in a complete loss of the business. *Id*. at *1. The plaintiff was not present at the time of the incident, but returned there after he was alerted of the fire. *Id*. The plaintiff sought damages for negligent infliction of emotional distress. *Id*. The *Lane* court favorably reviewed the Tennessee Supreme Court's statement in *Whaley v. Perkins*, which stated:

> Subject to some exceptions, generally, under ordinary circumstances, there can be no recovery for mental anguish suffered by plaintiff in connection with an injury to his or her property. Where, however, the act occasioning the injury to the property is inspired by fraud, malice, or like motives, mental suffering is a proper element of damage.

*Id.* at *3 (quoting *Whaley*, 197 S.W.3d 665, 670 (Tenn. 2006)). Thus, because the defendant's negligence resulted only in property damage, Mr. Lane could not recover for emotional injuries in the absence of any showing of fraud, malice, or like motives. *Lane*, 2017 WL 1176982, at *5.

The Court can find little daylight between the facts of *Lane* and the instant case. In the instant case, Ms. Hollingsworth claims that she suffered emotional distress from caring for lambs that died and from seeing the lamb fetuses. Thus, her distress arose from the damage to her property, the sheep. *See Golden v. Tennessee Farmers Mut. Ins. Co.*, 1987 WL 17990, at *1 (Tenn. Ct. App. Oct. 7, 1987) (personal property includes sheep). Plaintiffs have presented no evidence of fraud or malice by Mr. Fahrmeier. Accordingly, plaintiffs cannot recover for negligent infliction of emotional distress for damages to their sheep and this claim will be dismissed.

## IV. Negligent Misrepresentation

The complaint alleges that Mr. Fahrmeier made two misrepresentations: (1) he "supplied faulty information to Ms. Reichert Erickson when he told her that if he vaccinated the ewes, they would be free of live camploybacter [sic]" [Doc. 1 at ¶ 63]; and (2) he "supplied faulty information to Ms. Reichert Erickson when he did not tell her that she should give the ewes a booster one month after the vaccination" [*Id.* at ¶ 64].

Mr. Fahrmeier contends the first alleged misrepresentation is an opinion and representation of a future event; thus, it cannot be the basis of a negligent misrepresentation claim [Doc. 28 at pp. 10—13]. Mr. Fahrmeier also argues that Ms. Erickson could not have justifiably relied on his statements when he told her to check with her veterinarian and she said she would [*Id.* at p. 13]. Defendant characterizes the second alleged misrepresentation as a withholding of information, which cannot be the basis of a negligent misrepresentation claim [*Id.*]. In response, Ms. Erickson argues that Mr. Fahrmeier was negligent in stating that one shot of vaccine would render the lambs free of live bacteria and that defendant admitted as much when he stated "I wish I would never have suggested that one shot of vaccine might be enough" [Doc. 32 at pp. 14—15].

As this Court has previously discussed, a claim of negligent misrepresentation requires proof of the following elements: (1) the defendant supplied information to the plaintiff; (2) the information was false; (3) the defendant did not exercise reasonable care in obtaining or communicating the information; and (4) the plaintiff justifiably relied on the information. *Roopchan v. ADT Sec. Sys., Inc.*, 781 F. Supp. 2d 636, 654 (E.D. Tenn. 2011) (quoting *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn.

2008)). Further, in the context of business transactions, the plaintiff must establish the following elements:

> (1) the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; and
> (2) the defendant supplies false information meant to guide others in their business transaction; and
> (3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and
> (4) the plaintiff justifiably relies upon the information.

*Id.* (citing *John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 431 (Tenn. 1991)). The false information must "consist of a statement of a material past or present fact." *Id.* (quoting *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982)). Thus, "statements of opinion or intention are not actionable," and "representations concerning future events are not actionable even though they may later prove to be false." *Id.*

The first statement of which plaintiff complains is as follows:

> I think that because the ewe lambs were born to vaccinated ewes, if I give the lambs a vaccine shot before they leave the farm, that there would be very little to no chance that they would be carriers of the live bacteria. Best check with your vet.

[Doc. 28-2 at p. 5]. As defendant argues, this statement is really a prediction of what might happen: *if* the lambs are vaccinated, then there is *little to no chance* that they would be carriers of Campylobacter bacteria. Accepting for the moment that Mr. Fahrmeier did vaccinate the lambs prior to delivering them to the plaintiffs, his prediction turned out to be incorrect. Mr. Fahrmeier did not state that he had given the lambs a vaccine, although his statement implies that he intended to do so. Mr. Fahrmeier did not communicate a

12

statement of "material past or present fact," rather, he communicated a prediction of what would happen if he followed through with his intent to vaccinate the sheep. Thus, this statement is not an actionable misrepresentation. *See Gardner v. Anesthesia & Pain Consultants, P.C.*, No. E2003-03027-COA-R3-CV, 2004 WL 2715304 at *6 (Tenn. Ct. App. 2004) ("negligent misrepresentation cannot be based on conjecture, statements of opinion … or representations of future events").

The second statement of which plaintiffs complain is what Mr. Fahrmeier *did not* say: he did not tell her that she should give the ewes a booster one month after the vaccination. The evidence on which they base this allegation is Mr. Fahrmeier's statement on February 24, 2017, *after* the sale and *after* the abortion storm began, he wrote, "I wish I would never have suggested that one shot of vaccine might be enough" [Doc. 28-2 at p. 32]. Even if this statement had been made prior to the sale, it is a statement of conjecture and prediction of future events: one shot *might* be enough to prevent Campylobacter. Prior to the sale, as noted above, Mr. Fahrmeier did not state that "one shot of vaccine" was enough to prevent Campylobacter bacteria. He predicted "if I give the lambs a vaccine shot before they leave the farm … there would be very little to no chance that they would be carriers of the live bacteria." Again, it is implied, but not stated directly, that one vaccine shot would be sufficient. The *implication* that one shot of vaccine would be sufficient is not a "statement of a material past or present fact." *Roopchan*, 781 F. Supp. 2d at 654. Accordingly, the Court finds that this statement is also not an actionable misrepresentation. The claim for negligent misrepresentation will be dismissed.

13

## V.   Tennessee Consumer Protection Act

The complaint alleges that Mr. Fahrmeier violated Tenn. Code Ann. § 47-18-104(b)(2) "[b]y misrepresenting that the ewes had been vaccinated and that one vaccination was all that was needed to keep the ewes free of live Campylobacter" [Doc. 1 at ¶¶ 72—73]. Plaintiffs claim these misrepresentations were "both negligent and intentional," which Mr. Fahrmeier admitted, and caused plaintiffs substantial economic harm [*Id*. at ¶¶ 73—74].

Defendants argue that plaintiffs cannot establish each of the necessary elements of a TCPA claim [Doc. 28 at pp. 14—15]. Defendants contend that Mr. Fahrmeier did not engage in an "unfair or deceptive act or practice" as required by the TCPA for the same reasons that he did not make a misrepresentation to Ms. Erickson [*Id*.]. Plaintiffs reiterate their arguments that the proper vaccination protocol was not followed and that there is no evidence that Mr. Fahrmeier actually vaccinated the sheep [Doc. 32 at pp. 16—17]. Plaintiffs also argue that Mr. Fahrmeier admitted that he did not properly advise them on vaccination; thus, "Mr. Fahrmeier had something to hide, hid it, and sold the sheep anyway" [*Id*. at p. 17].

The TCPA generally prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104(a). The specific "unfair or deceptive act[] or practice[]" cited by the complaint is "[c]ausing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services." Tenn. Code Ann. § 47-18-104(b)(2). As defendants point out, plaintiffs have not clearly identified how they were confused as to the "source, sponsorship, approval, or

14

certification" of the sheep [*see* Doc. 33 at p. 12]. The Court will assume that plaintiffs claim that Mr. Fahrmeier "certified" – in a general sense – that the sheep were bacteria free.

In order to recover under the TCPA, the plaintiff must prove (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA, and (2) that the defendant's conduct caused an "ascertainable loss of money or property, real, personal, or mixed, or any other article or commodity, or thing of value wherever situated." *Roopchan*, 781 F. Supp. 2d at 656 (quoting *Tucker v. Sierra Builders*, 180 S.W.3d 109, 114—15 (Tenn. Ct. App. 2005) and Tenn. Code Ann. § 47-18-109(a)(1)). The TCPA does not define "unfair" or "deceptive" acts or practices beyond those specifically enumerated in section 47-18-104(b). An act or practice is "deceptive" if it involves a "material representation, practice or omission likely to mislead a reasonable consumer." *Id*. (quoting *Davis v. McGuigan*, 325 S.W.3d 149, 162 (Tenn. 2010)). An act or practice is "unfair" if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoided by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." *Id*.

Viewing the evidence in the light most favorable to the plaintiffs, the two statements discussed above are not deceptive within the meaning of the TCPA as they are not material representations. At most, Mr. Fahrmeier's statements were predictions of what he thought would happen *if* he vaccinated the sheep. Moreover, his representations or omissions could not have misled a reasonable consumer. As noted by the defendants, Mr. Fahrmeier repeatedly advised Ms. Erickson to consult with her veterinarian about the Campylobacter

15

vaccine – both before the sale of the sheep and after the abortion storm began. A reasonable consumer would have done so. Similarly, Mr. Fahrmeier's statements are not "unfair" within the meaning of the TCPA because the harm could have reasonably been avoided – Ms. Erickson could have consulted with her veterinarian as she was advised to do. No reasonable juror could conclude that Mr. Fahrmeier's statements were unfair or deceptive within the meaning of the TCPA and this claim will be dismissed.

## VI. Conclusion

For the reasons set forth above, the defendants' motion for partial summary judgment [Doc. 27] will be **GRANTED**. All claims against defendant Donna Fahrmeier will be dismissed. The claims against defendant Lynn Fahrmeier for negligent infliction of emotional distress, negligent misrepresentation, and violation of the Tennessee Consumer Protection Act will be dismissed. The case will proceed to trial on the claims of negligence and breach of contract against Lynn Fahrmeier. An appropriate order will be entered.

    s/ Thomas W. Phillips
SENIOR UNITED STATES DISTRICT JUDGE